Our first case today, 2016-1463, DAV v. Secretary of Veterans Affairs. Mr. Stoltz, please proceed. Good morning, Your Honors, and may it please the Court. Before the November 2015 change to the M21 manual, Gulf War veterans could qualify for service-connected benefits for their illness where it either lacked conclusive ideology or lacked a conclusive pathophysiology. Now, because of VA's changes to the M21, VA requires that both criteria be satisfied in order to establish service connection for a medically unexplained chronic multisymptom illness. Let me ask you a question. Why didn't you ask that this case be combined with Goodman, or at least argue together with Goodman at the same time? The case, Your Honor, in Prezl, the Goodman case, has this question in it, but there's a separate basis as well. In that case, we're also arguing that the medical examiner rendered an opinion that was not on an individual basis. It seemed to us that that was a specific case or controversy, whereas this was a cleaner challenge to the change to the M21. That was our thinking at least. I mean, except that you've got the jurisdictional overlay here that half the briefing is spent on, right? Correct, yes, Your Honor. And you wouldn't have that in the Goodman case? Well, again, because the Goodman case really asks another question, and this was the way that it was outlined. In addition to this one, right? We thought if this one was able to go first, it would lay more groundwork for Mr. Goodman's case, if that makes some sense. Okay. VA, Your Honors, also precluded veterans wholesale, veterans with sleep apnea, from establishing on a case-by-case basis that their condition is a medically unexplained chronic condition. Is the VA manual binding? It is, Your Honor. On who? It is binding on adjudicators at the regional offices, which is truly where the rubber meets the road in the VA system. That is where the millions of claims get filed every year, where the over a million claims get filed every year, that the Gulf War veterans, of whom the class is millions, is going to get the overwhelming majority of their decisions, is at the regional office and at the DRO levels. Yes, but under what authority is the manual binding? The manual is binding as a direction of the Secretary under 3.100. It has been read as binding. It's not binding on the board, right? Your Honor, I really would argue that it is under the statute. I believe that 19.5 contravenes the 7104 statute. But be that as it may, that is an argument that does not have to win the day for us to establish that the M21 provision is binding on the adjudicators and therefore a substantive rule because it is taking away the individual rights at the agency level, which, again, is where the rubber meets the road in the VA adjudication system. So while we do argue, and I would argue, that 19.5 is not in accordance, or I would argue two things. 19.5 is being read overly broadly, as we said in our pleadings. The board is bound to adjudicatory changes like this, but perhaps not the procedural side. But if we find that the manual doesn't fall under 552A1, then there's no jurisdiction here, correct? The interpretive versus substantive would be a harder row, but the court could still review. That's what this case is about, isn't it? The M21 is binding. But even if the M21 is found not to be binding, the change is in complete contravention of the plain language of the statute and regulation on point. So I believe that the court could still reach that VA's interpretation is wrong. And, again, it's something that may be brought up again in the President Goodman case, but the interpretation is still clearly arbitrary and capricious because the change is seen at page 100 of the record. VA strikes out the word or, which is what is in the actual regulation, and they just write and. But if I view that as simply interpretive and not a change, since there is a negative predicate at the beginning of that clause, it says without conclusive pathophysiology or etiology. So if I view the or as an and because of the without, you're in a negative space. It's saying you can't have this or this. If I say you can't have peas or carrots, or if I say to my children you can't have ice cream or cookies, I don't think that they're going to go eat cookies and believe they're not going to get in trouble. If I say to the kids that, right? I mean, you know, if you tell your children no ice cream or cookies, you think they're going to go have one and feel totally safe in doing so? My 16-year-old might try because he fancies himself a lawyer. I was going to say, Your Honor, it depends on how good of lawyers your kids might be. But my answer to that, Your Honor, would be that for years, that since the training letter in 2010 that's at record eight, for years the Department of Veterans Affairs gave this reading as disjunctive. It said pathophysiology or ideology. It also, for years, left this up on a case-by-case basis and relied on medical evidence. You're saying for years they read it disjunctively. What is your evidence that they did so? Was there a regulation that said the contrary of the current regulation? The regulation always said or. The training letter at record eight makes a very strong indication that what they were trained to do was to look at the ideology. If the ideology part was met, then they could find a MUCMI, a medically unexplained chronic multi-symptom illness. The manual mimicked the language of the regulation. The manual was fine when it did so. Then in the throes of litigation in 2015, they decided through a series of emails that are all part of the record that they needed to make a change. That change has the substantive effect of changing VA's policy that is found, again, at record eight and is found in the original way the manual read, VA's policy. Whether or not, Your Honor. What is a substantive change? It's a substantive change. How? Because before, Your Honor, before the reading of the plain language of the regulation and the way VA had implemented it, a veteran comes in and has to prove only one of these things. I get that, but the result is the same, isn't it? I mean, it's no cash, no credit. No, Your Honor. I would say, Your Honor, that it is not the same. Because in order to win under the reading of the plain language of the regulation before VA decided to change the regulation, before that, if you have a doctor that says, look, we understand how this condition, for example, rheumatoid arthritis is the example because that's the example that in the emails throughout this, and we'll touch on it, I'm sure, in the Presley-Goodman case. Rheumatoid arthritis, he was able to meet one part of that. Because of the emails and because of the change, the substantive change, now that appellant no longer is entitled to service connection. There is a very real, very tangible case that shows that under one reading it is liberal and under this repromulgation of the rule it is no longer liberal. So is your argument that the change here is that 552A1D, that this is a substantive rule of general applicability? Yes. Why doesn't it fall under 552A2C, Administrative Staff Manuals and Instructions? Because of the effect, because it has the legislative effect. But this is a manual. It is a manual. But it really is important, I think, Your Honor, for me to highlight that this manual, it is my understanding that this manual is a Bible, if you will. It is the manual for adjudicators because of their workload, because of the way this area of law changes. The M21 is on an adjudicator's desk or on a DRO's desk, and again this is my characterization of something, and it is what they look at. They are going to look at this, they are going to see the word and, and that is what they are going to go with. And that's going to happen thousands of times a day. Do you have examples of prior instances in which determinations were made that specific diseases were covered in an individual case, like rheumatoid arthritis or Parkinsonism or something else where the ideology is unknown even though the pathology is definable? There are none of record, Your Honor. I would be happy to go and look for those if it is of interest to the court. There are none of record. The rheumatoid arthritis case is really demonstrative. I think VA has rendered thousands of adjudications. I am... Well, I mean, you're taking the position that we shouldn't be looking at the face of the regulation and how it's worded because from a grammatical standpoint you have a little bit of a problem there. You're saying that we need to look at how they told everybody to interpret that regulation in the past. And what I'm trying to understand is, do we have actual concrete evidence that it was interpreted in a different way? There is none of record, Your Honor. Again, I'd be happy to look for some of those and submit those if it would be in the court's interest. Okay. If there are no further questions at this time, I'll yield the rest of my time for rebuttal. It looks like I'm getting into it. Okay. Thank you very much. Thank you. May it please the court. I'll start, if I may, with explaining why the revisions here are merely interpretive and are not themselves substantive rules with the force and effect of law. The crux of... Before you do that, is it correct that this is not binding? It is. We agree with the characterization that it is binding on the regional office employees who are adjudicating the claims, but it is not binding on the board, as we see in Regulation 19.5. And in the reply brief, DAV points to the statute in 7104 and references instructions of the secretary, but the VA adjudication manual qualifies as instructions to the regional offices, which are separate from the board, and so it's not instructions to the board. And, in fact, the instructions to the board language is referring to a term of art, really, that is a type of guidance that VA no longer issues. And so in a prior version of 19.5, it did actually reference instructions of the secretary, and that was removed when VA stopped using that type of guidance. And so now the VA's implementation of 7104 appears in 19.5 and quite clearly says that instructions that appear in, for example, the general counsel precedent opinions are binding on the board, but VA manuals, which are instructions to employees... And you represent that the board never cites to or relies on the VA manuals when making its decisions? Well, we're not saying they wouldn't cite to it. For example, we would cite to the VA manual sometimes in seeking our deference before this court. So it is appropriate for the board to look to the manual as indicative of the VA's interpretation or the VBA's interpretation, but it would not be binding on the board. And so that distinguishes this from a substantive rule where the rule, as the court explained in Splain, is binding law on entities outside of the agency and surely within the agency. So here we don't even have... So you're saying this is not a substantive rule change, but in the next case down the road with an individual claimant, you're then going to say, well, but it's not a substantive rule change, but we want deference, and so therefore you have to defer to our changing the rules. Well, there's no consistency there, Your Honor, because courts routinely give deference to agencies even in more informal instances. Like the Supreme Court's decision in our, for example, granted deference based upon an amicus brief. So the fact that we're saying it's not binding law is not inconsistent with us later saying that this is a fair and considered judgment of the Secretary on a given issue. And that gets back to the crux of the difference between substantive and interpretive. The rule here is coming from 3.317. That is the binding law. That is where the substantive rights are being drawn from. The revisions here merely qualify as guidance to VA employees and interpretations. So this case is just like... So is this an interpretation of the statute or an interpretation of the regulation? Because our deference only relates to interpreting regulations. You can't back in to Chevron deference because Mead makes it clear that interpretive decisions do not result in deference. Certainly, Your Honor. This is an interpretation of the regulation in 3.317. And we know that because if we just look to the analysis itself, it's drawing from the language that appears in the regulation's definition of a medically unexplained illness. So we're taking the regulatory language of without conclusive pathophysiology or etiology, and the VA is providing its interpretation that because, as the Court noted, there is this negative qualifier, so that translates to requiring both an inconclusive pathophysiology and an inconclusive etiology. But if it's medically unknown, I mean, there's lots and lots of conditions that, you know, whenever you say, how did I get this or why do I have this or what caused this, like Parkinsonism, rheumatoid arthritis, the answer is always, we don't know. Right? We don't know. So that would seem to relate just to etiology. Just because we know how your brain gets screwed up in one of these or how your nerves get messed up in one of these doesn't mean that we know anything, that it has become medically certain. Well, as Your Honor points out, there are any number of very well-established diseases that the medical literature and that medicine simply does not know the cause of. But the genesis of the medically unexplained amendment for presumptive service connection arose because of problems in applying the undiagnosed illness presumption. And essentially what happened was that there were advances in medical terminology that resulted in doctors applying diagnoses to collections of symptoms that had previously been undiagnosed. So these are the examples like chronic fatigue syndrome, fibromyalgia, irritable bowel syndrome, where there was really no understanding of how the disease presented in the body. There was no understanding of the pathophysiology or the etiology. And so Congress felt that the same challenges in establishing nexus that existed for undiagnosed illnesses would still exist for these illnesses despite the diagnosis that was effectively a diagnosis in name only. It was just a label and there was no understanding. So that's different than situations like multiple sclerosis or Crohn's disease or ulcerative colitis, where there are observable structural changes in the body that are known. So the pathophysiology is known. So there aren't the same challenges in establishing nexus. If the whole point is that because we don't know what this terrible herbicide exposure might have caused, if the whole point is that the presumption relates to causation, then why does pathophysiology matter? Because it provides a record for how the disease is progressing. There are veterans who establish service connection based on MS or multiple sclerosis or other diseases for which the etiology is unknown. And the VA has methods of determining nexus in those cases. So it's not the case that every time a disease is unknown, it's impossible to establish nexus. Give me an example of how you determine a nexus when there's no known etiology. Well, perhaps an example would be if the multiple sclerosis, for example, is having symptoms and also has been identified, there's been plaque in the brain identified. And so you can see that at an earlier date. And you can see as the disease progresses that the plaque is worsening. And so you can see that this is the same disease. You can see that this is progressing the way that multiple sclerosis would based on the medical understanding of the pathophysiology. So there is a reason why the regulation says, and this is getting back to the regulation, that this is both without conclusive pathophysiology yet to happen. So you're basically saying that there isn't a way to establish nexus if you have pathophysiology, even though you have no etiology. I'm sorry, Your Honor. I'm saying that there is a way. Given the known characteristics of diseases like multiple sclerosis, even though it's not known whether it comes from genetics or whether there's a specific environmental trigger, given the fact that the medical field knows how the disease progresses, that does provide a basis for establishing nexus. And this really gets back to the fact that in an interpretive rule, the agency is looking to the language of the regulation. As the Court explained in Splain, in a substantive rule, you would expect to see the sort of policymaking analysis that we're engaging in right now, whereas in an interpretive rule, you're looking to the language of the regulation and you're trying to parse out that meaning. So that's what the VA did here. They looked to the language of 3.317 and they came to a perfectly reasonable rule. So it limited only the regional office adjudicators. But that would be true for any instructions to employees. And does that limitation have the force of law? No, it has the same effect as any instruction to an employee. And I would note that DAV is perfectly right that the VA is responsible for adjudicating. Then why make the interpretation at all? Again, I asked you if the interpretation narrowly limits the administrative action. It does limit the regional office, Your Honor. And does that have force of law? No, it does not. But in answer to his question, it was a narrowing, correct? We will say it was a narrow limitation of the regional office, but that still is only one part of the VA. The VA also includes the board, and simply because the Court said in Splain, simply because any instruction to an employee is binding on that employee of the agency. But that does not mean that it has the same force of law as a regulation would, as a true regulation like 3.317, which is binding across the board. The language that you're now saying was just a mistake, about if it's diagnosable that it can't be covered, that is directly at odds with not just the statute, the language of the statute, but the purpose of the statute. And you're just saying, oh, well, that was a mistake. We didn't mean it. But by definition, you would be interpreting your regulation to be directly at odds with the statute, right? Well, I think the way we described it in our brief is not so much that it's a mistake, but it results from the VA's internal use of diagnosable as shorthand. And I'll agree that that is not the ideal way to make that point, but it does get the job done. And given the numerous questions... Well, when you say it gets the job done, the question is, does it get a job done consistent with the statute or not? I mean, it makes it seem like when you say using it as shorthand, that's exactly the shorthand that Congress was worried about. Well, no, Your Honor, because the VA is still acknowledging that by using shorthand, I mean it's shorthand for both undiagnosable and medically unexplained. And the real crux, though, of the sleep apnea analysis was that the numerous VA employees were asking questions about when to provide a medical examination despite an existing diagnosis of sleep apnea. So this was essentially, even within the questions that were being asked, there was essentially an understanding that sleep apnea itself is not a medically unexplained disease. And so the VA, in addition to noting that, that this does not qualify for presumptive service connection, and the court need look no further than the plain meaning of sleep apnea to see that there is, in fact, a known pathophysiology and a known cause for sleep apnea, so it would not qualify. Why didn't you just say that instead of saying because it has a diagnosis? Well, Your Honor, that would have perhaps been better, but that's in the plain meaning of sleep apnea itself. And again, the live manual process is designed to be a flexible, constantly changing process in which the VA is responding to questions from employees, in which the VA is providing guidance as necessary. So this is not perhaps the type of formal situation that would be presented had the petitioner sought, for example, a petition for rulemaking in which this court would then be able to review. This court would certainly have jurisdiction over a denial or partial denial of a petition for rulemaking. And in that scenario, the petitioner would have already presented their arguments to the VA, thus providing VA the chance to, on the record, describe it in full. Is the VA manual a statement of general policy or interpretation of general applicability formulated and adopted by the agency? Some provisions may very well be. The provisions that we're dealing with here we think better qualify as interpretations of the regulation, and so they're interpretations within a VA staff manual that are discussed most specifically in 552A2 and thus omitted from this court's jurisdiction in Section 502. And again, DAV in its reply brief says that there's a presumption of reviewability of agency action, and we don't dispute that, but this type of interpretation by the agency is reviewable and indeed will better assist the court with a better and more complete record in an appeal from a petition for a rulemaking or in an individual veteran's case. So just to be clear, you think that the statements in the VA manual that were made in this case fall under 552A2B, which are statements of policy or interpretation, or no, C, which is administrative staff manuals, right? And you think since it falls under 552A2C, it can't fall under 552A1D. Do you think those are exclusive? Because when you said some things in the VA manual could be, but we think this one is an interpretation, well, my problem with maybe it could be sometimes is that kind of contradicts your statutory interpretation argument because as I understand your argument, it's either under 2C, and we don't have review authority, or it's under A1D, and we do have review authority. So can you revisit your view? What is the government's position on whether something in the VA manual is something over which we have review authority? I think my time is almost up. May I answer? So a couple answers. In the jurisdictional analysis, your Honor is completely right that because this appears in the staff manual, this falls under 552A2C. And so the question I was getting at before is, is this interpretive or a statement of general policy? Both of those are examples of rules that are not substantive rules. And so if the assumption is that a substantive rule that appears in the M21 adjudication manual could still be substantive, we're setting that to one side, and we're saying so long as it is an interpretive rule or a statement of general policy that appears in the staff manual. For jurisdictional purposes, you're saying if there's something in the VA manual that amounts to a substantive rule of general applicability that we would then have review authority over it? Potentially, although even then, given the fact that the manual itself is not binding on the board, we think that there are numerous Not binding on the board and also not published in the Federal Register. Precisely, Your Honor. And not authorized, well, I guess it is authorized by law. You have the right to adopt things in the manual. So I'd say the short answer to your question, Your Honor, is that you are right. The M21 manual does fall under 552A2C. Do you have some rebuttal time, Mr. Stoltz? Thank you, Your Honor. Listening to VA's argument, it does seem clearer now, or clearer perhaps than it did before, that there is no longer a dispute of whether or not what happened at Record 100 and what happened with sleep apnea, perhaps even more egregiously since it is an entire condition that VA now reads out or now has changed the regulation not to allow anymore, that this is an administrative limiting. And because it is an administrative limiting, it is a substantive change in the law. They crossed out the word or and put an and. I would agree with you if the result of this limitation, this new limitation that we're talking about, if it achieved a different result. But it seems to me that the result is the same. Your Honor, I think that the record, it's discussion. Whether something is inconclusive for A or for B and they're read in combination, the result is the same if it's inconclusive for both. So that's where you begin to lose me, and maybe you can focus on that. Well, Your Honor, the record is replete with e-mails talking about a veteran's rheumatoid arthritis. And it is apparent from a reading of the record that is before the court that in those e-mail exchanges and in the actions in November 2015 that a veteran's rheumatoid arthritis would have qualified as a medically unexplained chronic multi-symptom illness under the plain language of the regulation and the reading that DAV is saying is acceptable. And it is no longer service-connectable because now ideology and pathophysiology are required. Those prongs are both required. That is a specific example of going under the way that it was. So before you only needed one prong, and you're saying now you need both. Exactly, Your Honor. Exactly. But if the result of either, the application of either prong is that you have inconclusiveness, then what's the difference? Because before a medic, for example, if you followed Record at Eight, if you followed that training manual, if you have a doctor come back and say, we don't know how he got it, we don't know how she got it, in other words, we don't know the ideology, you win. Or at least you get identified as a medically unexplained chronic multi-symptom illness. Now, because of this substantive rule change, it comes back, we don't know where it is, okay, do we know how it's affecting the system, the pathophysiology? Because you have to have both. Before, we don't know where it came from was good enough, on a case-by-case basis at least, to get to the point of finding a medically unexplained chronic multi-symptom illness. The adjudicator or the DRO would grant service connection and find a MUCMI. Now, after November 2015, you have to come back and you have to show, we don't know where it came from and we don't know how it's affecting your system. But this is challengeable through an individual action where someone has one of these conditions, correct? It is challengeable. And I understand that the government says, well, then it will last for our deference, but the problem is the regulation that they're purporting to interpret merely parrots the statute. So they've never actually done an interpretation of the statute. And so you can't get deference for interpreting your own regulation if the regulation doesn't say anything. It is challengeable, certainly in court. It is challengeable on an individual basis. But I would urge the court to strike it down today, because it does narrowly limit the administrative action for the thousands and perhaps millions of practical veterans that are going to go to the regional offices and ask for DRO review upon whom this manual is binding in their adjudicatory decisions. And because of that, it really is important that the court strike it down. Under the court's recent decision in month, could this be challenged on a class action basis? One would think, under this court's decision in month, of course, well, under my reading, I'm sorry, of the decision in month, the Court of Appeals for Veterans Claims has a lot of work to do in figuring out the rules. I would think so. But that's a long way down the road, and it's going to be subject to a lot of decisions at the veterans court level. Today, there is a mechanism for this provision, for this to be struck down, and the court should do so. Okay, I thank both counsel for their argument. The case is taken under submission.